**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

| | |
|---|---|
| WISCONSIN MASONS' HEALTH CARE FUND, on behalf of itself and all others similarly situated, | |
| Plaintiff, | Civil Action No.   2:18cv213 |
| v. | |
| MERCK & CO., INC.; MERCK SHARP & DOHME CORP.; SCHERING- PLOUGH CORP.; SCHERING CORP.; MSP SINGAPORE CO. LLC; GLENMARK PHARMACEUTICALS, LTD.; and GLENMARK PHARMACEUTICALS INC., USA, | JURY TRIAL DEMANDED |
| Defendants. | |

**END-PAYOR PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiff Wisconsin Masons' Health Care Fund (the "Fund") brings this class action on

behalf of itself and all others similarly situated against Defendants Merck & Company, Inc.,

Merck Sharp & Dohme Corporation, Schering-Plough Corporation, Schering Corporation, and

MSP Singapore Company LLC (collectively, "Merck"), and Glenmark Pharmaceuticals Limited

and Glenmark Generics Inc., U.S.A. (collectively, "Glenmark") and allege based on personal

knowledge, investigation of counsel, and upon information and belief as follows:

**I.      NATURE OF THE ACTION**

1.      Plaintiff brings this civil antitrust class action on behalf of an End-Payor Class,

who, since January 1, 2012, indirectly purchased, reimbursed, or otherwise paid for the drug

Zetia, a cholesterol drug that counteracts plaque build-up in the arteries. Merck conspired with

Glenmark to delay the entry of a generic version of Zetia. This anticompetitive conduct was

1

intended to and did in fact prevent a less expensive, generic equivalent of Zetia from entering the market. Defendants' actions violated state and federal antitrust and consumer-protection law and Plaintiff seeks to recover damages incurred as a result of Merck and Glenmark's illegal agreement not to compete in the Zetia market.

2.      Merck developed Zetia in the early 1990s to reduce cholesterol and prevent the buildup of plaques in the arteries. Merck obtained patent protection for the active ingredient in Zetia, ezetimibe, in a series of patents, which include U.S. Patent No. RE37,721 (the "RE'721 patent").

3.      Glenmark was the first manufacturer that sought to bring a generic version of Zetia to market in October 2006. Merck subsequently sued Glenmark in 2007 for infringement of the RE'721 patent, and Glenmark counterclaimed that the RE'721 patent was invalid and unenforceable. Glenmark cited evidence that key claims relating to patented compounds were invalid because Merck had disclosed them previously. Four of Glenmark's counterclaims—for anticipation, obviousness, double-patenting, and inequitable conduct—invoked similarities between the RE'721 patent and earlier Merck patents or patent applications. In a partial summary judgment order, the patent court invalidated four of the 13 claims in the RE'721 patent. Had the case proceeded to trial, Glenmark would have prevailed and obtained an order invalidating the remaining claims.

4.      Merck and Glenmark settled the patent litigation on May 10, 2010, before trial. As part of the settlement, they stipulated to vacatur of the court's order invalidating four of the claims in the patent. Merck paid Glenmark to refrain from selling a generic version of Zetia for several years, until December 12, 2016.

5.     Merck, in exchange, agreed not to launch its own generic version of Zetia—an "authorized generic"—until 180 days after Glenmark entered the market. Under the Hatch-Waxman Act, because Glenmark was the first firm to receive FDA approval of generic Zetia, no other firm could sell generic Zetia during the 180-day period. Merck's no-authorized-generic promise was worth an additional $800 million in sales to Glenmark.

6.     As the first generic filer, Glenmark earned the statutory right to keep other generic companies off the market for 180 days. But Glenmark could not keep Merck from selling its authorized generic. Brand companies launch authorized generics, particularly during a first filer's 180-day exclusivity period, in an effort to staunch the massive loss of revenue accompanying generic entry. Typically, the brand's authorized generic takes up to 50% of generic sales away from the first filer. So even though the authorized generic is sold at a lower price point than the brand, the authorized generic allows the brand to hold on to sales that it otherwise would lose.

7.     The parties thus traded monopoly for monopoly. Merck avoided patent invalidation and retained its lucrative Zetia monopoly until 2016 when Glenmark could enter the market with its generic product, and in return, Glenmark would gain a 180-day monopoly over generic Zetia.

8.     Had Merck not paid Glenmark to delay the entry of its generic, Glenmark and Merck would have each launched a generic version of Zetia as early as December 6, 2011, and, in any event, well before December 12, 2016. Additional generics would have launched after the expiration of Glenmark's 180-day exclusivity period. The presence of even one generic, if not more, would have driven Zetia prices down to competitive levels.

9.      Defendants' monopolistic conduct came at the expense of Zetia purchasers. Competing generic versions of Zetia were not sold until June 12, 2017. Purchasers were harmed twice: first during the extended period of brand exclusivity Merck gained from Glenmark's agreement to postpone generic entry, and again during the 180 days in which Glenmark enjoyed generic exclusivity due to Merck's agreement not to launch an authorized generic version of Zetia.

10.      Merck and Glenmark's anticompetitive agreement injured Plaintiff and the End-Payor Class by causing Zetia end-payor purchasers to pay tens of millions of dollars in unlawful overcharges. Without this agreement, Class members would have been able to buy less-expensive generic ezetimibe instead of branded Zetia from as early as December 6, 2011.

## II.     JURISDICTION AND VENUE

11.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred Class members, and at least one member of the putative Class is a citizen of a state different from that of Defendants.

12.      This Court has personal jurisdiction over each Defendant because they are present in the United States and in this district, transact business in the United States and in this district, have registered agents in the United States, may be found in the United States and in this district, and are otherwise subject to the service of process provisions of 15 U.S.C. § 22. Defendants' scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

13. Venue is appropriate within this District under 28 U.S.C. § 1391 because, at all relevant times, Defendants transacted business within this district and carry out inter- and intra-state trade and commerce in substantial part in this district. The acts complained of have and will continue to have substantial effects in this District.

## III.  PARTIES

### A.  Plaintiff

14. Plaintiff Wisconsin Masons' Health Care Fund is a self-funded, multi-employer health welfare plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), as amended. The Fund is administered by Benefit Plan Administration of Wisconsin at 2901 W. Beltline Highway, Suite 100, Madison, Wisconsin 53713-4226. During the Class Period, as defined below, the Fund purchased and/or provided reimbursement for brand Zetia and its generic equivalent. The Fund paid more than it would have absent Defendants' unlawful scheme to delay generic entry. As a third-party payor of pharmaceutical claims for its members, the Fund is an end-payor of Zetia and was injured as a result of Defendants' violations as alleged herein.

### B.  Defendants

15. Merck & Company, Inc. is a New Jersey corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

16. Merck Sharp & Dohme Corporation, a subsidiary of Merck & Company, Inc., is a New Jersey corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. Merck Sharp & Dohme Corporation is the assignee of patents relevant to this lawsuit.

17.     MSP Singapore Company LLC, a subsidiary of Merck & Company, Inc., is a Delaware company with its principal place of business at 200 Galloping Hill Road, Kenilworth, New Jersey 07033.

18.     Schering-Plough Corporation was a New Jersey corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

19.     Schering Corporation was a New Jersey corporation with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. Schering Corporation was a wholly owned subsidiary of Schering-Plough Corporation and the original assignee of the relevant patents.

20.     In 2009, as part of Merck & Company, Inc.'s acquisition of Schering-Plough Corporation, Merck & Company, Inc. merged into Schering-Plough Corporation. Schering-Plough Corporation thereafter changed its name to Merck & Company, Inc., and the company formerly known as Merck & Company, Inc. changed its name to Merck Sharp & Dohme Corporation.

21.     Merck & Company, Inc., Merck Sharp & Dohme Corporation, Schering-Plough Corporation, Schering Corporation, and MSP Singapore Company LLC are collectively referred to in this complaint as "Merck."

22.     Glenmark Pharmaceuticals Limited is an Indian company with corporate offices in Mumbai, India.

23.     Glenmark Pharmaceuticals Inc., USA, formerly known as Glenmark Generics Inc., U.S.A., is a subsidiary of Glenmark Pharmaceuticals Limited and is a Delaware corporation with its principal place of business at 750 Corporate Drive, Mahwah, New Jersey 07430.

24.     Glenmark Pharmaceuticals Limited and Glenmark Generics Inc., U.S.A. are collectively referred to in this complaint as "Glenmark."

25.     All of Defendants' actions described in this complaint were part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered and/or performed by Defendants' various officers, agents, employees, and other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and with the actual, apparent, and/or ostensible authority of Defendants.

## IV.     THE PRESCRIPTION DRUG REGULATORY FRAMEWORK

26.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), governs the manufacturing, sale, and marketing of pharmaceuticals in the United States. Under the FDCA, a company wanting to sell a new drug must submit a New Drug Application ("NDA") to the Food and Drug Administration ("FDA") and provide scientific data demonstrating that the drug is safe and effective for a specific indication. *See id*. § 355(b)(1). The process to obtain FDA approval for an NDA is long, comprehensive, and costly because an NDA must include specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

27.     As compensation for this regulatory burden, drug manufacturers are allowed to protect their new products by listing applicable patents in the FDA's "Orange Book." *Id*. § 355(b)(1), (c)(2). The Orange Book, formerly known as "Approved Drug Products with Therapeutic Equivalence Evaluations," includes all FDA-approved prescription drugs, their approved generic equivalents, and any patents that purportedly protect each drug.

7

28.     Drug patents typically last twenty years. *See* 35 U.S.C. § 154(a)(2). The patent exclusivity period incentivizes drug innovation by allowing drug manufacturers to recoup their initial research and development costs and make a substantial profit on top.

29.     Although the FDA lists patents in the Orange Book, it does not examine the validity of Orange Book patent submissions. Instead, the FDA performs a purely ministerial function—the FDA lists any patents that the NDA-holder claims cover its drug. *See Teva Pharmaceuticals, USA, Inc. v. Leavitt*, 548 F.3d 103 (D.C. Cir. 2008) ("When it comes to the veracity of the patent information supplied by NDA holders, FDA operates in a purely ministerial role, relying on the NDA holders to provide the Agency with accurate patent information."). In other words, drug companies are free to list patents in the FDA's Orange Book as claiming a particular drug, without FDA scrutiny, subject only to subsequent patent challengers.

30.     In addition to the ordinary patent term, the FDA has authority to grant manufacturers additional market exclusivity periods to incentivize the development of particularly beneficial or necessary drugs. For instance, a manufacturer is eligible to receive five years of additional FDA exclusivity if it develops a "new chemical entity" ("NCE"); three years if it develops a new, but non-NCE product; and seven years if it develops a drug that treats a rare condition (i.e., an "orphan drug"). These periods of FDA exclusivity, beyond the ordinary patent term of twenty years, often compensate for unfairness in the ordinary patent process and incentivize the development of drugs in traditionally unprofitable markets.

31.     In 1984, Congress enacted the Drug Price Competition and Patent Term Restoration Act, known as the Hatch-Waxman Act, to facilitate competition from low-price generic drugs while maintaining the incentive for companies to research and develop new

products. *See Caro Pharm. Labs., Ltd. V. Novo Nordisk A/S*, 132 S. Ct. 1670, 1676 (2012) (The Hatch-Waxman Act is "designed to speed the introduction of low-cost generic drugs." (internal citations omitted)). The Act permits generics to come to market as soon as brand drugs lose patent protection and encourages generic manufacturers to challenge the scope and validity of existing brand patents. *See FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2228-29 (2013).

32.     Once the FDA has approved a brand drug, the Hatch-Waxman Act eliminates the need for generic manufacturers to file lengthy and costly NDAs, and instead allows a generic manufacturer to obtain similar approval by filing an Abbreviated New Drug Application ("ANDA") specifying that the generic has the same active ingredient and is "biologically equivalent" ("bioequivalent") to—*i.e.*, absorbed at the same rate and to the same extent as—the reference brand drug. *See* 21 U.S.C. §§ 355(j)(2)(A)(ii), (iv).

33.     The FDCA and Hatch-Waxman amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart. 21 U.S.C. § 355(j)(8)(B). The FDA assigns generics that meet these criteria relative to their brand counterparts an "AB" rating.

34.     The ANDA application process allows generic manufacturers to rely on a reference drug's original clinical studies, thereby reducing the cost and time necessary to bring a generic drug to market. *See Actavis*, 133 S. Ct. at 2228.

9

35.     As a result of the cost savings for the manufacturer, generic drugs cost 80-85% less on average than their brand counterparts and dramatically reduce healthcare expenses.[1] In 1983, before the Hatch-Waxman amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[2] Generics are dispensed about 95% of the time when a generic form is available.[3]

36.     When a company seeks to market a generic counterpart to a brand drug through the ANDA process, the company must certify that it will not infringe any of the patents listed in the Orange Book for the reference drug. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV) ("[Each ANDA shall contain] a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each which claims the listed drug . . . or which claims a use for such listed drug for which the applicant is seeking approval under this subsection . . . ."). An ANDA-filer must certify that it will not infringe any patents claiming to cover the reference product because either: (1) no patents are listed in the Orange Book (a "paragraph I certification"); (2) all applicable patents have expired (a "paragraph II certification"); (3) the applicant will not introduce a generic drug until all applicable patents have expired (a "paragraph III certification"); or (4) all applicable patents are invalid or will not be infringed by the proposed generic product (a "paragraph IV certification"). *Id.*

---

[1] FDA Center for Drug Evaluation and Research, *The Lower Price Doesn't Mean Inferior*, at 2 (2012), *available at* http://www.fda.gov/Drugs/ResourcesForYou /Consumers/BuyingUsingMedicineSafely/Understanding GenericDrugs/ucm305896.htm
[2] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014).
[3] *Id*. at 51.

37.     If a generic manufacturer files a paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. Thus, a paragraph IV certification usually triggers litigation between the generic applicant and the NDA holder. *Actavis*, 133 S. Ct. at 2228.

38.     If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-half years (commonly called the "30-month stay"), or (ii) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. 21 U.S.C. § 355(j)(5)(B)(iii). Until one of those conditions occurs, the FDA may grant "tentative approval," but cannot authorize the generic manufacturer to market its product (i.e., grant final approval). The FDA may grant an ANDA tentative approval when it determines that the ANDA is ready for final approval but for the 30-month stay.

39.     Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the PTO, by court decision, or by jury verdict. A patent holder at all times bears the burden of proving infringement.

40.     A generic can prevail in such litigation by showing that its product does not infringe the patent, that the patent holder cannot meet its burden to prove infringement, or by showing that the patent is invalid or unenforceable.

41.     A patent is invalid or unenforceable when the disclosed invention is obvious in light of earlier prior art.

42.     A patent is also invalid or unenforceable when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails

11

to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution.

43. A patent is also invalid or unenforceable when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

44. In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

45. As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, it is more likely that a challenged patent will be found invalid or not infringed than upheld. The FTC reports that generics prevailed in 73% of Hatch-Waxman patent litigation cases resolved on the merits between 1992 and 2002.[4] An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 similarly reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[5]

46. The Hatch-Waxman Act encourages manufacturers to seek approval of generic versions of brand drugs by granting exclusivity periods to certain filers. The first paragraph IV

---

[4] FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* vi-vii (2002), https://www.ftc.gov/sites/default/files/documents/reports/generic-drug-entry-prior-patent-expiration-ftc-study/genericdrugstudy_0.pdf.

[5] John R. Allison, Mark A. Lemley & David L. Schwartz, Understanding the Realities of Modern Patent Litigation, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

generic manufacturer ANDA filer—the "first filer"—is granted a 180-day exclusivity period to market the generic version during which no other ANDA for the same brand drug may be approved by the FDA. 21 U.S.C. § 355(j)(5)(B)(iv), (D).

47.     This 180-day period of exclusivity is very valuable to the first filer. *See Actavis*, 133 S. Ct. at 2229.

48.     While other generic manufacturers are stalled in pursuing an ANDA for that brand drug, the brand manufacturer (such as Merck) can—at any time, even during this 180-day exclusivity period—launch an "authorized generic." The brand manufacturer simply manufacturers the authorized generic in accordance with its approved NDA for the branded product but sells the authorized generic at a lower price point. This is a frequent practice in an effort for the brand manufacturer to recoup some of the sales they would otherwise lose.

49.     An authorized generic is essentially the same as the brand drug but in a different package: it is chemically identical to the brand drug, and manufactured under the brand name drug's NDA, but sold as a generic product—often through either a brand manufacturer's subsidiary (if it has one) or through a third-party distributor. Competition from an authorized generic substantially reduces drug prices and the revenue of the first-filer generic. If the first-filer generic has regulatory or de facto exclusivity, an authorized generic reduces the revenue of the first-filer generic by at least half. In other words, the absence of an authorized generic can more than double the first-filer's revenue.

50.     Authorized generics are priced like other generics and compete on price with other generics. One study notes that "pharmaceutical developers facing competition from

13

generics have large incentives to compete with their own or licensed 'authorized generics.'"[6] A study analyzing three examples of authorized generics found that "[f]or all three products, authorized generics competed aggressively against independent generics on price, and both the authorized and independent generics captured substantial market share from the brand."[7]

51.    Given the financial stakes tied to the entry of a generic drug, brand companies have devised additional methods to frustrate the public policy in favor of generic competition by extending their product monopolies. For example, brand companies have entered "reverse payment" settlements with impending generic manufacturers. In these settlements, a brand manufacturer who holds a questionable patent compensates a potential generic rival to drop its patent challenge. In this way, both companies agree to split the brand manufacturer's monopoly profits. In 2013, the U.S. Supreme Court decided that this type of "reverse payment"—also known as a "pay-for-delay" settlement—could subject the participants to antitrust liability. *Actavis*, 133 S. Ct. 2223.

52.    Although civil litigation often ends with a settlement that includes the transfer of something of value from the defendant to the plaintiff, in a reverse-payment settlement, the plaintiff instead pays the defendant. That is, a brand manufacturer pays a generic manufacturer to delay or abandon market entry, and to abandon the challenge to the validity of the brand drug company's patent or patents. Such settlements are anticompetitive; the brand companies unlawfully maintain monopoly profits and effectively split them with generic companies in return for generic delay. Plaintiffs and the putative Class end up paying for it all, or, as the

---

[6] Hassett, K. A. and R. J. Shapiro, "The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals," Sonecon, May 2007, p. 3.

[7] Berndt, E., R. Mortimer, A. Bhattacharjya, A. Parece and E. Tuttle, "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," Health Affairs, v. 26, n. 3, May/June 2007, p. 796.

14

Supreme Court has put it: "The patentee and the challenger gain; the consumer loses." *Actavis*,
133 S. Ct. at 2235

53.    A first-filer generic, in particular, can help the brand manufacturer "game the
system" by delaying not only its own market entry, but also the market entry of all other generic
manufacturers. By agreeing not to begin marketing its generic drug, the first generic applicant
delays the start of its 180-day period of generic market exclusivity. This tactic—sometimes
referred to as "parking exclusivity"—creates a bottleneck because later generic applicants cannot
launch generic versions of the product until the first-filer generic applicant's 180-day exclusivity
has elapsed or is forfeited. Thus, settlements between brand and first-filer generics provide a
strong disincentive against generic product development by other generic manufacturers.

54.    Drug companies commonly disguise reverse-payment agreements by cloaking the
bribe as a promise from the brand manufacturer to refrain from launching an authorized generic
version of a drug when the parties agree that the generic competitor can bring its product to
market. Because the availability of an authorized generic severely diminishes the profitability to
a generic manufacturer of launching its own version of a drug, a brand manufacturer's agreement
not to launch an authorized generic has tremendous financial value to a first-filer generic
manufacturer.

55.    Payment to the first-filer generic company in the form of a no-authorized-generic
promise is economically equivalent to a cash payment by the brand manufacturer because the
promise effectively doubles (or more) the revenues and profits of the generic company. The
brand manufacturer foregoes the substantial sales and revenue that it otherwise would make with
its own authorized generic, but in return for allocating all generic sales to the generic company,
the brand manufacturer can obtain a later generic entry date from the generic company. The

brand manufacturer wins because it maintains monopoly profits on its brand drug longer than it otherwise would without bribing the generic company, and the generic company wins because it will enjoy supra-competitive generic profits itself when it does enter the market at a later date. Payers, however, lose; generic drug availability is delayed, and when it finally comes (if it comes at all), it is more expensive than it should be because the brand manufacturer and generic company have already allocated the market.

56.     For a generic first-filer of a brand product that sold hundreds of millions of dollars annually, like Zetia, the difference between selling a generic product without having to compete against an authorized generic and competing with such an authorized generic amounts to hundreds of millions of dollars. These economic realities are well known in the pharmaceutical industry. No-authorized-generic agreements allow competitors to benefit from an agreement not to compete and deny purchasers the consumer surplus that should flow to them from increased competition. Thus, no-authorized-generic reverse payments are even worse for consumers than cash reverse payments because consumers are overcharged twice in no-authorized-generic agreements: once during the period of generic delay, when consumers are forced to pay for the brand instead of the generic, then again when the authorized generic is withheld from the market and the available generic is priced higher than it should be because it faces no competing generic price pressure.

57.     For this reason, courts that have considered the effects of no-authorized-generic agreements have almost universally found such promises to violate the antitrust laws under *Actavis*.[8] As the Third Circuit—the first appellate court to consider whether a no-authorized-

---

[8] *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.* ("*Lamictal*"), 791 F.3d 388, 403 (3d Cir. 2015) (holding that no-authorized-generic agreements may constitute payments under *Actavis*); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2015 U.S. Dist. LEXIS 35634 (D.

16

generic agreements may constitute a reverse payment under *Actavis*—explained: "[No-authorized-generic] agreements are likely to present the same types of problems as reverse payments of cash," because they are sufficiently valuable to generic companies to induce the generic companies to abandon their challenge to weak or invalid patents and refrain from competing in the market.[9]

## V.    The Competitive Effects of AB-rated Generic Competition

58.    Besides Hatch-Waxman, generic substitution laws in all fifty states and the District of Columbia also strongly encourage the use of generic drugs. These laws allow, and sometimes require, pharmacists to fill brand prescriptions with cheaper AB-rated generic equivalents, unless the prescribing physician directs otherwise. An "AB-rated" generic drug is a generic equivalent drug determined by the FDA to meet strict bioequivalence testing standards basically showing that it has the same efficacy and safety profile as the referenced brand drug.

59.    The marketplace for the sale of prescription pharmaceutical products in the United States contains a unique and significant feature that can be exploited by a brand

---

Conn. Mar. 23, 2015) (holding that defendants "clearly agree" that a no-authorized-generic promise "is very valuable" and recognizing "[a] majority of courts to have examined the issue" have ruled "that 'payment' is not limited to cash transfers"); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1070 (N.D. Cal. 2014) ("I agree with the bulk of the recent decisions holding that courts need not restrict the definition of 'payments' under *Actavis* to cash."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751-52 (E.D. Pa. 2014) (finding "the term 'reverse payment' is not limited to a cash payment" and holding that a "no-[authorized-generic] clause itself" is a "reverse payment"); *Time Ins. Co. v. Astrazeneca AB*, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014) ("[R]everse payments deemed anti-competitive pursuant to *Actavis* may take forms other than cash payments"); *see also King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, No. 06-cv-1797, 2015 WL 356913, at *15-16 (E.D. Pa. Jan. 28, 2015) (analyzing reverse payment settlements under *Actavis* and finding that jury could conclude that side deals were simply a means of providing payments for delay and/or inducing generics to stay off market).

[9] *Lamictal*, 791 F.3d at 404.

manufacturer in order to extend its monopoly over a particular product. In most industries, the person who selects a product for purchase must also pay for that product. Therefore, normally, the price of the product plays a critical role in the consumer's choice of products and, consequently, sellers have a strong incentive to lower the price of their products to remain competitive.

60.     The pharmaceutical marketplace, by contrast, suffers from a "disconnect" between payment obligation and product selection. The patient (and in many cases his or her insurer or Health Plan) has the obligation to pay for the pharmaceutical product, but the patient's physician chooses which product the patient will buy.

61.     Studies show that physicians typically are not aware of the relative costs of pharmaceutical products and that, even when physicians are aware of the relative cost, they are insensitive to price differences, because they do not pay for the products themselves. The result is a marketplace in which price plays a comparatively unimportant role in product selection and there is very little cross-elasticity of demand among differentiated products within a therapeutic class of drugs. This, in turn, gives brand manufacturers the ability to raise or maintain price substantially above competitive levels without losing sales (unless, of course, there is an AB-rated generic of the brand drug available).

62.     Many pharmaceutical manufacturers, including Defendants, exploit this feature of the pharmaceutical marketplace. Brand manufacturers employ armies of sales representatives, known as "detailers," who descend upon physicians' offices in an effort to persuade physicians to prescribe the manufacturer's products. Importantly, these detailers do not advise the physicians of the cost of the brand products.

18

63. State substitution laws were specifically designed to fix the disconnect in the United States healthcare industry between the doctors who prescribe, but do not pay for, the drugs, and the individuals and institutions who pay for, but do not select, them.

64. As a result of the public policy encouraging lower-priced generics, as codified in the Hatch-Waxman Act and state substitution laws, brand manufacturers typically lose 80-90% market share within one year of generic competition.

65. The only material difference between AB-rated generic drugs and their corresponding brand versions is their price. Because generic versions of a corresponding brand drug product are commodities that are not differentiated through advertising or other means, the primary basis for generic competition is price.

66. According to the FDA and the FTC, the greatest price reductions are experienced when the number of generic competitors goes from one to two. In that situation, there are two entirely undifferentiated generic products that compete solely on price. Conservative estimates show that a single generic launch results in a near term retail price reduction of around 10%, but that with two generic entrants, near term retail price reduction is about 50%.

## VI. DEFENDANTS' ANTICOMPETITIVE SCHEME TO DELAY GENERIC ENTRY

### A. Development of Zetia.

67. High levels of cholesterol are associated with coronary heart disease and atherosclerosis. One treatment for high cholesterol inhibits the enzyme Acyl-CoA cholesterol acyltransferase (ACAT). In the early 1990s, Merck researched new ACAT inhibitors. Its scientists identified a lead compound, SCH-48461, and inherent metabolites and metabolite-like analogues of that compound, including SCH-58235 or "ezetimibe," which later became the active ingredient in Zetia.

19

68.     SCH-48461 and ezetimibe share a central, core structure known as azetidinone (*see* Figures 1, 2, and 3 below). Unlike SCH-48461, however, ezetimibe has fluorine added to two of its phenyl rings (*i.e.*, groups of carbon atoms bonded to each other and to hydrogen atoms in a cyclic pattern, shown as hexagons in Figures 2 and 3). Adding fluorine was not innovative in method or theory. The addition required only routine laboratory techniques. Moreover, its primary effect was to keep the compound in the body longer, and this effect from adding a halogen like fluorine was well known in the scientific community before Merck's patent applications.

**Figure 1. Azetidinone (core structure)**

**Figure 2. SCH-48461**

**2  SCH 48461**
$ED_{50}$ 2.2 mg/ kg

20

**Figure 3. SCH-58235, Ezetimibe**

1  SCH 58235
$ED_{50}$ 0.04 mg/ kg

69.     Beginning in 1993, Merck filed a series of related U.S. patent applications regarding azetidinone compounds that can be used to reduce cholesterol. Three issued as patents; one of these then *re*issued twice.[10] These patents include the '365 patent, the '115 patent, the '966 patent, the RE'721 patent, and the RE'461 patent.

//

//

//

///

///

///

///

///

///

///

///

//

---

[10] All of the patent applications and communications with the PTO described herein were done by Schering Corporation and its agents, unless otherwise noted.

**Figure 4. The Patents.**



*All expiration dates are calculated without pediatric exclusivity extensions.

**B.    The '365 Patent.**

70.    On September 21, 1993, Merck filed U.S. Patent Application 102,440. This application—entitled "Hydroxy-Substituted Azetidinone Compounds Useful As Hypocholesterolemic Agents"—described the use of azetidinone compounds to reduce cholesterol.

71.    Merck abandoned the '440 application. On June 9, 1994, however, Merck filed U.S. Patent Application 257,593 as a continuation-in-part of the abandoned '440 application.

72.    The '365 patent again described the use of azetidinone compounds to reduce cholesterol:

- It states that the "invention relates to hydroxyl-substituted azetidinones useful as hypocholesterolemic agents in the treatment and prevention of atherosclerosis . . . the invention also relates to a process for preparing hydroxyl-substituted azetidinones." Further, "[a] few azetidinones have been reported as being useful in lowering cholesterol and/or in inhibiting the formation of cholesterol-containing lesions in mammalian arterial walls."

- The specification notes, "We have found that the compounds of this invention lower serum lipid levels, in particular serum cholesterol levels. Compounds of this invention have been found to inhibit the intestinal absorption of cholesterol and to significantly reduce the formation of liver cholesteryl [sic] esters in animal models. Thus, compounds of this invention are hypocholesterolemic agents by virtue of their ability to inhibit the intestinal absorption and/or esterification of cholesterol; they are, therefore, useful in the treatment and prevention of atherosclerosis in mammals; in particular in humans."

73.    The '365 patent has four claims, each relating to a process for preparing an azetidinone formulation (known as "formula I"). The summary of the invention describes cholesterol-reducing compounds of formula I or a pharmaceutically acceptable salt of those compounds. It states that the invention "relates to" all of the following:

23

- "[A] method of lowering the serum cholesterol level in a mammal in need of such treatment comprising administering an effective amount of a compound of formula I";

- "[A] pharmaceutical composition comprising a serum cholesterol-lowering effective amount of a compounds of formula I in a pharmaceutically acceptable carrier";

- "[T]he use of a hydroxyl-substituted azetidinone cholesterol absorption inhibitor of formula I for combined use with a cholesterol biosynthesis inhibitors [e.g., statins] . . . to treat or prevent atherosclerosis or to reduce plasma cholesterol levels"; and

- "[A] process for preparing certain compounds of formula I comprising [five steps]."

74.     The specification states that "all isomers, including enantiomers . . . are contemplated as being part of this invention." The invention also "includes . . . racemic mixtures." The specification notes that compounds of the invention can exist in "pharmaceutically acceptable" salt forms, identifies at least two dozen salt forms, and describes how to prepare salt forms.

75.     The '365 patent was never listed in the Orange Book; process patents are not eligible for listing.

76.     The '365 patent expired on May 20, 2014.

**C.     The '115 Patent**

77.     On September 14, 1994, before the '365 patent issued, Merck filed a PCT/US94/10099 application, as a continuation-in-part of the '593 application. The PCT'099 application added two exemplar compounds (3L and 3M) in the specification as well as *in vivo* data for 3L, 3M, and 6A-1.

24

78.     On March 18, 1996, the PCT'099 application entered the U.S. national stage as U.S. Patent Application No. 617,751 under 35 U.S.C. § 371. The specification for the '751 application was identical to the specification for the PCT'099 application.

79.     On June 16, 1998, the '751 application issued as U.S. Patent No. 5,767,115.

80.     The '115 patent had nine claims. Ezetimibe, the active ingredient in Zetia, falls within the scope of claims 1-3, 5, and 7. The specification designates ezetimibe as "6A" and describes it in Example 6 at column 31, and in claim 7 at column 40, lines 19-21.

81.     The '115 patent expired on June 16, 2015.

**D.      Reissue of the '115 Patent as RE'721 with New Ezetimibe Claims**

82.     On June 15, 2000, Merck filed Reissue Application No. 09/594,996, asking the Patent Office to reissue the '115 patent. Merck stated that it was filing the reissue application "to correct an error concerning the failure to appreciate the full scope of the invention by not including claims of narrower scope directed to one of the most preferred compounds disclosed in the specification," namely ezetimibe. Merck sought to add claims 10-13. Claims 10 and 11 claimed ezetimibe. Claim 12 claimed a composition of ezetimibe. Claim 13 claimed a method of using ezetimibe to treat or prevent atherosclerosis or reduce plasma cholesterol levels.

83.     In a declaration supporting Merck's application, James R. Nelson, Staff Vice President and Associate General Counsel, Patents & Trademarks at Schering-Plough Corporation and Vice President at Schering Corporation, described the earlier error as "the failure to include a specific claim to one of the most preferred compounds," later specified as ezetimibe.

84.     On May 28, 2002, the RE'996 application issued as U.S. Patent No. RE37,721 with new claims 10-13. This was the patent at issue in the subsequent litigation with Glenmark.

25

**E.       The Zetia NDA.**

85.       On December 27, 2001, while its application for reissue remained pending, Merck submitted NDA 21445 seeking FDA approval to market ezetimibe tablets for the treatment of hypercholesterolemia under the brand name Zetia.

86.       The FDA requires applicants to identify all patents that claim their drug. Thus, Merck reviewed its patent portfolio while preparing its NDA for Zetia.

87.       On October 25, 2002, the FDA approved the Zetia NDA and granted it a five-year New Chemical Entity exclusivity. Merck launched Zetia later that month. Zetia provided Merck with immediate and growing profits. Annual U.S. sales of branded Zetia were about $1 billion in 2010, $1.4 billion in 2014, and $2.6 billion by 2016.

88.       On December 12, 2002, after the Patent Office granted its reissue application, Merck—via James Nelson of Schering—requested a 497-day extension of the term of the reissued RE'721 patent based on the duration of the FDA's review of the Zetia NDA.

89.       On January 17, 2006, the Patent Office granted the requested 497-day extension. As a result, the RE'721 patent was set to expire on October 25, 2016.

**F.       Merck Uses Litigation to Thwart Competition to Zetia.**

90.       On October 25, 2006, generic drug manufacturer Glenmark filed ANDA 78-560, seeking FDA approval to market an AB-rated generic version of Zetia.

91.       Glenmark's ANDA contained a paragraph IV certification for each Zetia patent then listed in the Orange Book, including the RE'721 patent.

92.       On or about February 9, 2007, Glenmark sent a letter to Merck (then Schering) notifying it of its ANDA filing and describing why the Zetia patents were invalid, unenforceable, and not infringed by Glenmark's product.

26

93.     On March 22, 2007, Merck sued Glenmark in the District of New Jersey for infringement of the RE'721 patent. That was the only patent Merck claimed Glenmark's generic version of Zetia would infringe.

94.     On May 23, 2007, Glenmark answered, pleaded its affirmative defenses, and counterclaimed. Glenmark filed a corrected answer on June 7, 2007. On March 10, 2008, Glenmark filed a first amended answer and counterclaim.

95.     Glenmark's counterclaim sought a declaratory judgment that the RE'721 patent was invalid or unenforceable, on the following bases:

- *Invalidity due to inherent anticipation.* Glenmark argued that at least two compounds claimed in the RE'721 patent are inherent metabolites of SCH-48461—i.e., when SCH- 48461 is ingested, it is metabolized to form these two compounds. SCH-48461 was disclosed in an earlier Schering patent application, International Application No. PCT/US92/05972, filed on July 21, 1992, and published on February 4, 1993, as WO 93/02048.

- *Inequitable conduct for failure to disclose inherency.* Glenmark argued that Merck committed inequitable conduct while prosecuting the RE'721 patent by failing to disclose the inherency of these metabolites to the Patent Office. Nor did Merck disclose material publications describing the work its scientists had done to investigate SCH- 48461, its metabolites, and its metabolite-like analogues.

- *Inequitable conduct regarding patent term extension.* Glenmark argued that Merck also committed inequitable conduct when seeking the RE'721 patent term extension, by knowingly failing to disclose that at least some claims were invalid due to inherent anticipation.

- *Invalidity due to lack of enablement.* Glenmark argued that the RE'721 patent does not teach one skilled in the art how to use ezetimibe to prevent atherosclerosis without further experimentation.

- *Failure to name inventors.* Glenmark argued that Merck failed to name all inventors in the RE'721 patent.

- *Lack of proper reissue.* Glenmark argued that reissue was improper, and hence the reissued claims were invalid, for failure to identify any error in the '115 patent of the type that reissue may properly correct.

27

- *Invalidity due to obviousness-type double patenting*. Glenmark argued that the subject matter claimed in the RE'721 patent was not patentably distinct from matter claimed in Merck's earlier-expiring '365 patent.

96.     Only the claim of improper reissue was decided on the merits. On April 19, 2010, U.S. District Judge Jose L. Linares granted in part Glenmark's motion for partial summary judgment, finding that reissue of the '115 patent had been improper because Merck had not identified the sort of alleged error that reissue can correct. This ruling had the effect of nullifying claims 10-13, which claimed ezetimibe expressly. Merck sought reconsideration of the court's order on April 30, 2010.

97.     On April 24, 2009, while the patent suit was pending, the FDA granted tentative approval to Glenmark's Zetia ANDA. Glenmark thus gained first-filer status, securing the 180-day statutory period for exclusive generic sales. At that time, however, Hatch-Waxman's 30-month stay (running from February 9, 2007, the date of Glenmark's paragraph IV certification) prevented the FDA from granting final approval to Glenmark's Zetia ANDA.

98.     Trial before Judge Linares was scheduled to begin on May 12, 2010. On May 10, 2010, Merck and Glenmark settled their dispute.

99.     To nullify an adverse judicial ruling on the RE'721 patent, Merck and Glenmark jointly requested that the court vacate its partial summary judgment invalidating claims 10-13. The court entered the parties' proposed order setting aside the partial summary judgment.

100.    The parties further agreed, subject to certain undisclosed exceptions, that Glenmark would not market or sell its generic Zetia product until December 12, 2016.

101.    The settlement agreement was not docketed with the court, nor have the parties publicly revealed any of its other terms. The parties' later behavior makes clear, however, what the key settlement terms were.

28

102.     As a quid pro quo for Glenmark's agreement to drop its patent challenge and delay market entry for several years, Merck promised not to launch a competing authorized generic version of Zetia during Glenmark's 180-day exclusivity period.

103.     This agreement can be inferred for two reasons. First, when Glenmark finally began selling generic Zetia, Merck did not launch an authorized generic despite the likelihood of substantial profits had it done so and despite its track record of launching authorized generics. Other branded drugs for which Merck has sold authorized generic versions include Blocadren, Clinoril, Cozaar, Diprolene, Lotrisone, Nasonex, Singulair (Oral Granules), Temodar, Blocadren, K-Dur 10, K-Dur 20, and Lotrimin AF. The only economically rational explanation for Merck not launching an authorized Zetia generic is a no-authorized-generic agreement.

104.     Second, Glenmark suggested publicly that it did not expect competition from an authorized generic. By May 2017, Glenmark's Zetia sales accounted for 58% of combined brand and generic Zetia sales. In that month, Glenmark informed its shareholders of its pre-launch estimate that it would ultimately control even more of the Zetia market than that. Typically, a generic entrant in competition with an authorized generic will take roughly 40% of the combined sales, whereas a generic entrant not facing competition will take roughly 80%. Glenmark's public statement makes sense only if it did not expect competition with an authorized generic.

**G.     The Consequences of the No-Authorized-Generic Agreement.**

105.     Glenmark and Merck reached their no-authorized-generic agreement in May 2010. The agreement delayed Glenmark's generic entry until December 2016. Absent the agreement generic entry would have occurred much sooner than it did, and as early as December 6, 2011.

106. By December 6, 2011, the RE'721 patent stood as the only impediment to the prompt approval and launch of generic Zetia. Glenmark's ANDA had already received tentative FDA approval. Merck never asserted any other patent rights against Glenmark's Zetia formulation. Merck had performed a pediatric study for which, on June 5, 2008, it was granted a new patient population exclusivity and a pediatric exclusivity, but these and all other Zetia exclusivities expired as of December 6, 2011.

107. Merck and Glenmark could have settled their patent suit lawfully or proceeded to trial. A lawful settlement would have included a license for an earlier generic entry date corresponding to the parties' respective views on the likelihood of patent invalidation. Because the RE'721 patent was very weak—and indeed had already been hollowed out at summary judgment—the negotiated entry date would have been as early as the expiration of the last relevant Zetia exclusivity, on December 6, 2011. Alternatively, had the patent suit been tried, Glenmark would have prevailed on the grounds discussed above. Glenmark then would have launched Zetia as early as the exclusivities expired—December 6, 2011. Either way, but for the no-authorized-generic agreement, Merck would have launched an authorized generic version of Zetia at or close to the time that Glenmark launched its generic version.

**H.     The Value of the No-Authorized-Generic Agreement to Merck.**

108. The known economics of the pharmaceutical industry permit an estimate of how much value the no-authorized-generic agreement provided to Merck and Glenmark.

109. The agreement enabled Merck to maintain its monopoly on Zetia from December 2011 to December 2016. Absent the agreement, Merck's revenue during that time would have been limited to the revenue it could have earned in a competitive Zetia market. It follows that the

30

value to Merck of the no-authorized-generic agreement equals its branded Zetia sales during those five years minus the sales it would have made in a competitive market during that period.

110.    In a competitive market, Merck would have derived revenue from its exclusive sales of the brand drug during the five years and its sales of the authorized generic during the first six months of generic competition. After other generic competitors entered the market, Merck's sales of its authorized generic would have been negligible.

111.    But for the no-authorized-generic agreement, Merck's sales of the brand drug in each of the five years of competition would have equaled about 10% of its sales in its final year of exclusivity. Zetia sales in 2011 totaled $1.298 billion. So, in a competitive market, Merck could expect to receive revenue of roughly $649 million ($1.298 billion $\times$ 0.1 [for annual branded sales] $\times$ 5 [for five years]).

112.    Additionally, Merck's authorized generic and Glenmark's generic, combined, would have captured about 80% of total sales within the first six months after their entry, with generic sales divided between them (i.e., approximately 40% each). These generics would have sold at approximately 50% of the price of the brand. Under these estimates, Merck would have earned approximately $129.8 million from sales of authorized Zetia generics in the first six months after generic entry ($1.298 billion $\times$ 0.5 [half a year] $\times$ 0.8 [generic share of the market] $\times$ 0.5 [Merck's share of the generic sales] $\times$ 0.5 [generic price]).

113.    Thus, absent the no-authorized-generic agreement, Merck reasonably could have expected Zetia revenues of approximately $778.8 million ($649 million [for brand sales] + $129.8 million [for authorized-generic sales in the first six months of generic competition]).

114.    With the no-authorized-generic agreement, Merck reasonably could have expected to keep its branded sales at least at 2011 levels—$1.298 billion—for the next five

years. It therefore reasonably expected Zetia revenue of at least $6.49 billion. In fact, Merck's actual revenue from branded Zetia from December 2011 to December 2016 totaled more than $9.1 billion.

115. Based on the foregoing, as a result of the no-authorized-generic agreement, Merck gained around $8.3 billion in additional sales. The value of the no-authorized-generic agreement to Merck greatly exceeded the litigation expenses Merck saved by settling with Glenmark.

## I. The Value of the No-Authorized-Generic Agreement to Glenmark.

116. The value of the no-authorized-generic agreement to Glenmark equals the sales it could have expected during its six-month exclusivity period in 2016 minus the sales it would have made during the first six months after entering a Zetia market that included an authorized generic alternative.

117. As described above, under competitive conditions, Glenmark and Merck would have captured roughly equal sales of generic Zetia during the first six months of generic competition. Accordingly, Glenmark's revenue during this period would have about been the same as Merck's—approximately $129.8 million.

118. With the no-authorized-generic agreement, however, Glenmark could expect to earn more revenue.

119. Free from no-authorized-generic competition, Glenmark could expect its generic to capture 80% of the market for Zetia at a price discounted only 10% from the brand's price. Under those anticompetitive conditions, Glenmark would (a) make 100% (not 50%) of generic sales during the first six months after generic launch (because no authorized generic would take market share); (b) be able to sell its generic Zetia during that time for about 90% (not 50%) of the branded price (because no authorized generic would reduce pricing); and (c) benefit from its

32

generic Zetia entering a drug market after five-year delay period when demand would likely be greater.

120. By 2016, U.S. sales of Zetia totaled $2.6 billion. Thus, during its actual six-month exclusivity period in 2016—when there were no competing generic sales from Merck—Glenmark realized about $936 million in sales ($2.6 billion × 0.5 [half a year] × 0.8 [generic share of the market] × 0.9 [generic price]).

121. These estimates show that the agreement with Merck to delay Glenmark's launch of generic Zetia until December 2016 was worth approximately $806 million in additional sales to Glenmark, compared to sales it would have made beginning in December 2011 without the exclusionary effect of the no-authorized-generic agreement ($936 million minus $129.8 million).

122. Even if Glenmark did not anticipate the degree to which Zetia demand would increase during the five-year delay period, the no-authorized-generic agreement was still lucrative from Glenmark's standpoint when it entered into that agreement. If one were to assume that sales of branded Zetia would remain at 2010 levels until Glenmark entered with its generic in 2016, the no-authorized-generic promise would still be worth an additional $225 million to Glenmark over what it would have made from launching its generic in December 2011 ($985,823,000 [2010 brand sales] × 0.5 [half a year] × 0.8 [generic share of the market] × 0.9 [generic price] = $354,896,280 [estimated Glenmark generic Zetia sales under 2010 market conditions with no-authorized-generic agreement] - $129,891,200 [estimated Glenmark generic Zetia sales under 2010 market conditions without no-authorized-generic agreement] = $225,005,080.).

123.    The no-authorized-generic agreement, therefore, provided Glenmark with hundreds of millions in additional Zetia sales. The agreement caused Glenmark to gain more profits that it would have gained had it won the patent suit.

**J.      Reissue of the RE'721 Patent as RE'461.**

124.    On June 9, 2010, within a month after settling with Glenmark, Merck applied to the Patent Office for reissue of the RE'721 patent.

125.    Merck and its agents admitted that the RE'721 patent was at least partially invalid due to inherent anticipation, just as Glenmark had argued. In a declaration accompanying the reissue application, Mark Russell, legal director of patents for Schering Corporation, checked a box indicating that "the original patent [was] wholly or partly inoperative or invalid" because "the patentee claim[ed] more than he had the right to claim" in the patent. He elaborated:

> At least one error upon which reissue is based is described as follows: At least one claim of RE37,721 E is potentially inherently anticipated by International published patent application WO 93/02048, filed July 21, 1992 (PCT/US92/05972) and published February 4, 1993 ('the '048 PCT publication'). See also European patent application EP 0524595 A1. In infringement litigation involving RE37,721 E, defendants have alleged that the PCT'048 publication recites, in Example 9, a compound, that when administered to mammals, as also reported in the PCT'048 publication, metabolizes into one or more compounds that fall within the scope of at least claims 1 of RE37,721 E.

126.    Attorneys Carl A. Morales and James F. Haley, Jr., of Ropes and Gray LLP, attorneys and agents for reissue applicants, made similar statements. To address these problems, they proposed to cancel claims 1-2 and 4-6 and amend claims 3 and 7-9.

127.    On June 14, 2011, the RE'721 patent reissued as U.S. Patent No. RE42,461.

128.    The RE'461 patent included only claims 8 through 13, as amended, and portions of claims 3 and 7, of the RE'721 patent at issue in the Glenmark litigation.

**K.    Glenmark Sold Generic Zetia for Six Months Without Facing Generic Competition.**

129.    The FDA granted final approval to Glenmark's ANDA 78-560 for Zetia on June 26, 2015. In doing so, the FDA confirmed that Glenmark was entitled to 180 days of generic market exclusivity upon launch.

130.    From December 12, 2016, through June 12, 2017, Glenmark sold the only generic Zetia in the United States. Although it was entitled to do so by law, Merck did not launch an authorized generic version of Zetia during Glenmark's 180-day exclusivity period.

131.    On or about June 12, 2017—the day Glenmark's exclusivity period ended—the FDA approved generic Zetia ANDAs previously filed by seven competing firms: Teva (ANDA 78-724), Sandoz (ANDA 203-931), Amneal (ANDA 208803), Apotex (ANDA 208332), Ohm Laboratories (ANDA 207311), Zydus (ANDA 204331), and Watson Laboratories (ANDA 200831).

132.    Five of these manufacturers—Teva, Sandoz, Amneal, Apotex and Ohm Laboratories—launched a generic Zetia product in June 2017, shortly after receiving FDA approval. Zydus launched its generic Zetia product in August 2017. Watson Laboratories did not launch a generic Zetia product because it sold its generic drug business to Teva before June 2017.

133.    Aurobindo, which filed an eighth ANDA (ANDA 209838), received FDA approval in August 2017 and began selling generic Zetia that month.

134.    The FDA approved a ninth ANDA, of Alkem Laboratories (ANDA 209234), in December 2017.

135. The average retail price of ezetimibe tablets dropped from $10 per pill before Glenmark's launch to less than $1 per pill as of December 1, 2017.

136. Merck has never sold a generic version of Zetia.

## VII. CLASS ACTION ALLEGATIONS

137. Plaintiff brings this action on behalf of itself and all others similarly situated (the "End-Payor Class" or "Class") under Federal Rules of Civil Procedure 23(a) and (b)(3), seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States") on behalf of the following Class:

> All persons and entities in the Indirect Purchaser States that indirectly purchased, paid for and/or provided reimbursement for some or all of the purchase price of Zetia or its AB-rated generic equivalents in any form from Defendants from December 6, 2011, until the effects of Defendants' conduct cease (the "Class Period").

138. The following persons or entities are excluded from the proposed End-Payor Class:

a. Defendants and their officers, directors, management, employees, subsidiaries or affiliates;

b. All governmental entities, except for government funded employee benefit plans;

c. All persons or entities who purchased Zetia for the purposes of resale or directly from Defendants and their affiliates;

d. Fully insured health plans (i.e., Plans that purchased insurance from another entity that covered 100% of the Plan's reimbursement obligations to its members);

e. Any "flat co-pay" consumers whose purchases of Defendants' Zetia or generic Zetia were paid in part by a third-party payor and whose co-payment was the same regardless of the retail purchase price;

f. Pharmaceutical Benefit Managers; and

g. The judges in this case and any members of their immediate families.

139.   Members of the Class are so numerous that joinder is impracticable. Plaintiff believes the Class includes hundreds of thousands, if not millions, of consumers and thousands of third-party payors.

140.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all Class members were damaged by the same wrongful conduct by Defendants. Class members paid artificially inflated prices for brand Zetia as a result of Defendants' unlawful conduct and were deprived of the opportunity to purchase less-expensive generic Zetia.

141.   Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests coincide with those of the Class.

142.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

143.   Questions of law and fact common to the members of the Class predominate over questions that affect individual Class members because virtually all of the legal and factual questions in the case center on Defendants' conduct and Defendants' conduct affected the entire Class similarly.

144.   Questions of law and fact common to the Class include:

   a.   Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive generic suppression scheme;

   b.   Whether Defendants' anticompetitive scheme suppressed market entry of generic Zetia;

   c.   Whether Defendants conspired to delay generic competition for Zetia;

   d.   Whether Defendants' scheme, in whole or in part, has substantially affected interstate and intrastate commerce;

   e.   Whether Defendants' scheme, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiff and the members of the Class;

f.  Whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

g.  Whether, pursuant to the reverse payment agreement, Merck's promise not to compete against Glenmark's generic product constituted a payment;

h.  Whether Merck's agreement with Glenmark was necessary to yield some cognizable, non-pretextual procompetitive benefit;

i.  To the extent such justifications exist, whether there were less restrictive means of achieving them;

j.  Whether the reverse payment harmed competition;

k.  Whether Defendants' unlawful anticompetitive conduct was a substantial contributing factor in causing some amount of delay in the entry of an AB-rated generic Zetia; and

l.  The quantum of overcharges paid by the End-Payor Class in the aggregate.

145. Proceeding on a classwide basis is a superior method for the fair and efficient adjudication of the controversy because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expenses that individual actions would entail. Class treatment will allow injured persons and entities to seek compensation for injuries that would not be practical to pursue individually. These benefits substantially outweigh any difficulties that may arise out of class treatment.

146. Plaintiff does not know of any legitimate reason that this action cannot be pursued as a class action.

## VIII. EFFECTS OF THE SCHEME ON COMPETITION AND DAMAGES TO THE PLAINTIFF AND THE CLASS

147. Merck's U.S. sales of Zetia were approximately $1.3 billion in 2010, $1.4 billion in 2012, $1.5 billion in 2014, and $2.6 billion in 2016. These amounts represent billions of dollars more in sales than Merck would have achieved absent Defendants' unlawful scheme to impair generic competition. Generic Zetia products would have been priced at a fraction of the cost of brand Zetia, and would have quickly captured the vast majority of the market for ezetimibe.

148. Merck's last regulatory exclusivity relating to Zetia ended on December 6, 2011. But for the unlawful agreement described herein, Glenmark would have entered the market on or shortly after that date, and in any event well before December 12, 2016.

149. Merck's and Glenmark's unlawful agreement impaired and delayed the sale of generic Zetia in the United States and unlawfully enabled Merck to sell its branded Zetia at artificially inflated prices, and then allowed Glenmark to sell is generic Zetia at artificially inflated prices. But for Merck's unlawful conduct, generic competitors would have been able to compete, unimpeded, with their own generic versions of Zetia, at a much earlier date.

150. Were it not for Defendants' anticompetitive conduct, Plaintiff and other Class members would have paid less for Zetia by (a) substituting purchases of less expensive AB-rated generic Zetia for their purchases of more expensive branded Zetia, and (b) purchasing generic Zetia at lower prices sooner. As a result of Defendants' illegal conduct as described herein, Plaintiff and Class members were forced to pay, and did pay, artificially inflated prices for Zetia.

151. As a consequence, Plaintiff and other end-payors have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## IX. EFFECT ON INTERSTATE AND INTRASTATE COMMERCE

152. Defendants' anticompetitive conduct has substantially affected intrastate, interstate, and foreign commerce.

153. During the relevant time period, Defendants manufactured, sold, and shipped Zetia and generic Zetia across state lines in an uninterrupted flow of interstate commerce.

154. During the relevant time period, Plaintiff and Class members purchased substantial amounts of Zetia and/or generic Zetia in each state. As a result of Defendants' illegal conduct, Plaintiff and the Class members were compelled to pay, and did pay, artificially inflated prices for Zetia and generic Zetia in each state.

155. Contracts, bills, and other forms of business communications pertaining to Zetia were transmitted in a continuous and uninterrupted flow across state lines in the exchange of intrastate and interstate commerce. The scheme in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

156. Defendants' anticompetitive conduct occurred in part in trade and commerce within the states set forth herein. Defendants' conduct had substantial interstate and intrastate effects because retailers within each state have been foreclosed from offering cheaper generic versions of Zetia. This directly impacted and disrupted commerce for end-payors within each state who have been forced to continue to pay *supra*-competitive prices. The End-Payor Class would have paid less for their Zetia prescriptions by purchasing generic Zetia, had one been available.

40

## X. ANTITRUST IMPACT

157. Defendants' anticompetitive conduct enabled them to raise, fix, maintain, and stabilize prices to consumers and third-party payors far above the prices Defendants would have been able to charge absent such conduct.

158. Any overcharge for branded Zetia and AB-rated generic Zetia at a higher level of distribution in the chain of distribution for Zetia results in higher prices at every level below.

159. The institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the supracompetitive prices of branded Zetia and AB-rated generic Zetia to Plaintiff and Class members.

160. Plaintiff and Class members paid artificially inflated prices for Zetia as a direct, proximate, and foreseeable result of Defendants' anticompetitive conduct.

161. Defendants' unlawful anticompetitive conduct alleged herein enabled them to indirectly charge end-payors prices in excess of what they otherwise would have been able to charge absent their unlawful actions.

## XI. MARKET POWER

162. As discussed above, the relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs is what economists and antitrust courts refer to as market power. The result of these pharmaceutical market imperfections and marketing practices is that

41

brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Zetia.

163.   Until December 12, 2016, Merck had monopoly and market power over Zetia—broadly defined to include Zetia and its AB-rated generic equivalents—because Merck had the power to maintain the price of Zetia at supracompetitive levels without losing substantial sales to make supracompetitive prices unprofitable.

164.   From December 12, 2016, to June 12, 2017, Glenmark and Merck combined had a monopoly and market power in the market for Zetia and its generic equivalent because they had the power to maintain the price of ezetimibe at supracompetitive levels without losing substantial sales to make supracompetitive prices unprofitable.

165.   Merck's market share in the relevant market was 100% until December 12, 2016, during which time it exercised monopoly power. From December 12, 2017, Merck and Glenmark together held 100% of the relevant market and each exercised oligopoly power in it until June 12, 2017, when Teva, Mylan, Sandoz, Amneal, Apotex, Ohm Laboratories/Sun Pharmaceuticals, Zydus, and Watson Laboratories all launched generic Zetia products.

166.   Brand Zetia is differentiated from all other ezetimibe products, and all other hypercholesterolemia treatments, other than the AB-rated generic versions of Zetia.

167.   A small but significant price increase for Zetia by Defendants would not have caused a significant loss of sales to drug products other than competing AB-rated generic versions of Zetia.

168.   Defendants needed to control only the market for Zetia and its AB-rated generic equivalents, and for no other products, in order to profitably maintain Zetia prices at supracompetitive levels. Only entry of a competing, AB-rated generic version of Zetia would

have prevented Defendants from profitably maintaining supracompetitive Zetia prices without losing substantial sales.

169. During the 180-day exclusion period, Merck sold brand Zetia and Glenmark sold generic Zetia at prices well in excess of marginal costs and in excess of the competitive price, and, therefore, Merck and Glenmark enjoyed high profit margins.

170. Defendants possessed and exercised the power to exclude and restrict competition over Zetia and its AB-rated generic equivalents.

171. Defendants sold Zetia at supracompetitive prices far above competitive levels and well in excess of marginal costs, and enjoyed high profit margins as a result.

172. Defendants enjoyed high barriers to entry in the relevant product market due to asserted patent rights, other regulatory protections, and high entry costs.

173. Plaintiff alleges that the relevant market is Zetia (i.e., Zetia and its AB-rated generic equivalents).

174. The relevant geographic market is the United States, the District of Columbia, and its territories.

## XII.    CONCEALMENT TOLLED THE STATUTE OF LIMITATIONS

175. Defendants fraudulently concealed their illegal scheme to monopolize the market for Zetia and its injurious effects on consumers by failing to report it while reaping illicit profits from the supracompetitive prices they charged.

176. Due to Defendants' concealment of their unlawful conduct, however, Plaintiff and Class members are entitled to recover damages reaching back even beyond four years of the filing of this complaint. That Merck paid Glenmark in the form of a no-authorized-generic agreement was not discoverable until after Glenmark launched its generic ezetimibe in December

2016. At that time, Merck did not launch an authorized generic then, or after six months, or ever. Merck and Glenmark had earlier disclosed only cursory information about the existence of the settlement. Plaintiff and Class members had no knowledge of Defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years before the filing of this complaint.

177. This is true because of the nature of Defendants' scheme was self-concealing and because Defendants employed deceptive tactics and techniques of secrecy to avoid detection of, and to conceal, their contract, combination, conspiracy and scheme.

178. Defendants wrongfully and affirmatively concealed the existence of their ongoing combination and conspiracy from Plaintiff and Class members by, among other things:

a. Concealing the fact of Merck's agreement not to launch a competing authorized generic Zetia product in exchange for Glenmark's agreement not to market its competing generic product until December 12, 2016;

b. Concealing the fact that the purpose of the no-authorized-generic agreement was to provide compensation to Glenmark in connection with the settlement of the patent litigation and the December 2016 entry date for Glenmark's generic product; and

c. Filing documents with the United States Securities and Exchange Commission that failed to disclose the existence or nature of the payments made.

179. Because the scheme and conspiracy were both self-concealing and affirmatively concealed by Defendants, Plaintiff and Class members had no knowledge of the scheme and conspiracy more than four years before the filing of this complaint; nor did they have the facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

180. Plaintiff and Class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence

44

on the part of Plaintiff and Class members would not have uncovered those facts more than four years before the filing of this complaint.

181. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and Class members' claims have been tolled.

182. A cause of action accrued for Plaintiff each time Defendants sold a product to Plaintiff at a supra-competitive price made possible by their anticompetitive conduct. And each sale by Defendants of a product at a supra-competitive constituted another overt act in furtherance of their anticompetitive scheme. Accordingly, Plaintiff is entitled to recover all damages on all sales that Defendants made to Plaintiff at supra-competitive prices within four years of the filing of this lawsuit.

## XIII. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Monopolization under State Law

183. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

184. As described above, from December 12, 2016 through June 12, 2017, Merck shared its monopoly power with Glenmark, and the two companies jointly maintained an illegal monopoly throughout that time.

185. Defendants willfully and unlawfully engaged in a continuing illegal conspiracy to monopolize the relevant market through at least June 12, 2017, by engaging in an anticompetitive scheme to keep generic equivalents from the market-not as a result of providing a superior product, business acumen, or historical accident.

186. Defendants knowingly and intentionally conspired to maintain and enhance each other's monopoly power in the relevant market, as described herein, injuring Plaintiff and the Class. Defendants accomplished this scheme by, inter alia,

45

a. Delaying generic entry of Zetia in order to lengthen the period in which Merck's brand Zetia could monopolize the market and make supra-competitive profits;

b. Keeping an authorized generic off the market during Glenmark's 180-day generic exclusivity period, thereby allowing Glenmark to monopolize the generic market for Zetia during the period, and allowing Glenmark to make supra-competitive profits;

c. Raising and maintaining the prices that the Plaintiff and other members of the Class would pay supracompetitive prices for Zetia; and

d. Otherwise conspiring to unlawfully monopolize and conspiring to monopolize the relevant market.

187. The goal, purpose, and effect of Defendants' scheme was also to maintain and extend Merck's monopoly power with respect to Zetia. Defendants' illegal scheme allowed Merck to continue charging supra-competitive prices for Zetia, without a substantial loss of sales, reaping substantial unlawful monopoly profits. Defendants' scheme allowed Glenmark to reap the benefits of reduced generic competition in the United States.

188. There is and was no legitimate, non-pretextual, procompetitive justification for Defendants' conduct that outweighs its harmful effects. Even if there were some conceivable justification, the conduct is and was broader than necessary to achieve such a purpose.

189. As a result of Defendants' illegal conduct, Plaintiff and members of the Class were compelled to pay, and did pay, more than they would have paid for Zetia and/or its generic Zetia absent Defendants' illegal conduct. But for Defendants' illegal conduct, competitors would have begun selling generic Zetia sooner than they did, and prices for Zetia and generic Zetia would have been lower, sooner.

190. Had manufacturers of generic Zetia entered the market and lawfully competed with Defendants in a timely fashion, Plaintiff and other members of the Class would have substituted lower-priced generic Zetia for the higher-priced brand-name Zetia for some or all of

46

their Zetia requirements, and/or would have paid lower net prices on their remaining Zetia and generic Zetia purchases.

191. But for Defendants' illegal conduct, competitors would have begun marketing generic versions of Zetia well before December 12, 2016, and they would have been able to market such versions more successfully.

192. By engaging in the foregoing conduct, Defendants intentionally, willfully, and wrongfully monopolized the relevant market in violation of the following state laws:

a. Ariz. Rev. Stat. §§ 44-1403, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Arizona by Class members and/or purchases by Arizona residents.

b. Cal. Bus. and Prof. Code §§ 17200, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in California by Class members and/or purchases by California residents.

c. D.C. Code Ann. §§ 28-4503, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in the District of Columbia by Class members and/or purchases by D.C. residents.

d. Fla. Stat. §§ 501.201, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Florida by Class members and/or purchases by Florida residents.

e. Iowa Code § 553.5 et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Iowa by Class members and/or purchases by Iowa residents.

f. Mass. Gen. L. Ch. 93A, § 1 et seq., with respect to purchases in Massachusetts by members of the Class.

g. Me. Rev. Stat. Ann. 10 § 1102, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Maine by Class members and/or purchases by Maine residents.

h. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Michigan by Class members and/or purchases by Michigan residents.

47

i.  Minn. Stat. §§ 325D.49, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Minnesota by Class members and/or purchases by Minnesota residents.

j.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Mississippi by Class members and/or purchases by Mississippi residents.

k.  Mont. Code Ann. §§ 30-14-205, et seq. with respect to purchases in Montana by members of the Class.

l.  Mo. Rev. Stat. §§ 407.010, et seq., with respect to purchases in Missouri by members of the Class.

m. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Nebraska by Class members and/or purchases by Nebraska residents.

n.  Nev. Rev. Stat. Ann. § 598A.010, et seq., with respect to purchases in Nevada by Class members and/or purchases by Nevada residents.

o.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire by members of the Class.

p.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in New Mexico by Class members and/or purchases by New Mexico residents.

q.  N.Y. Gen. Bus. Law § 349, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in New York by Class members and/or purchases by New York residents.

r.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in North Carolina by Class members and/or purchases by North Carolina residents.

s.  N.D. Cent. Code § 51-08.1-03, et seq., with respect to purchases in North Dakota by Class members and/or purchases by North Dakota residents.

t.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Oregon by Class members and/or purchases by Oregon residents.

u.  R.I. Gen. Laws §§ 6-36-5, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Rhode Island by Class members and/or purchases by Rhode Island residents.

v. S.D. Codified Laws Ann. § 37-1-3.1, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in South Dakota by Class members and/or purchases by South Dakota residents.

w. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Tennessee by Class members and/or purchases by Tennessee residents.

x. Vt. Stat. Ann. Tit. 9, § 2453, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Vermont by Class members and/or purchases by Vermont residents.

y. W.Va. Code §§ 47-18-4, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in West Virginia by Class members and/or purchases by West Virginia residents.

z. Wis. Stat. § 133.03, et seq., of Zetia and AB-rated generic equivalents in Wisconsin by Class members and/or purchases by Wisconsin residents.

193. Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiff and Class members were: (1) denied the opportunity to purchase lower-priced generic Zetia; and (2) paid higher prices for Zetia and/or generic Zetia than they would have paid but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

194. Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

## SECOND CLAIM FOR RELIEF
### Conspiracy and Combination in Restraint of Trade under State Law

195. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

196. During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Zetia and/or its AB-

49

rated generic equivalents in unreasonable restraint of trade and commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

197. During the Class Period, Defendants and their co-conspirators entered into an unlawful reverse payment agreement that restrained competition in the market for Zetia and/or its AB-rated generic equivalents.

198. Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Zetia and/or its AB-rated generic equivalents.

199. As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated end-payors in the Class who purchased Zetia and/or its AB-rated generic equivalents have been harmed by being forced to pay inflated, supra-competitive prices for Zetia and/or its AB-rated generic equivalents.

200. In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

201. Defendants' conspiracy had the following effects, among others:

a. It delayed generic entry of Zetia in order to lengthen the period in which Merck's brand Zetia could monopolize the market and make supra-competitive profits;

b. It kept an authorized generic off the market during Glenmark's 180-day generic exclusivity period, thereby allowing Glenmark to monopolize the generic market for Zetia during the period, and allowing Glenmark to make supra-competitive profits; and

c. It raised and maintained the prices that Plaintiff and other members of the Class would pay for Zetia at supra-competitive levels.

202.   From December 12, 2016 through June 12, 2017, Merck shared its monopoly power with Glenmark, and the two companies jointly maintained an illegal monopoly throughout that time.

203.   Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of Zetia and/or its AB-rated generic equivalents.

204.   There was no legitimate, non-pretextual, pro-competitive business justification for this reverse payment agreement that outweighs its harmful effect on end-payors and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve the purpose. Accordingly, these acts constitute violations or flagrant violations of the antitrust laws of various states.

205.   By engaging the foregoing conduct, Defendants intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of the following state antitrust laws:

   a. Ala. Code §§ 6-5-60, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Alabama by Class members and/or purchases by Alabama residents.

   b. Ariz. Rev. Stat. §§ 44-1402, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Arizona by Class members and/or purchases by Arizona residents.

   c. Cal. Bus. and Prof. Code §§ 16720, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in California by Class members and/or purchases by California residents.

   d. D.C. Code Ann. §§ 28-4502, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in the District of Columbia by Class members and/or purchases by D.C. residents.

51

e.  Haw. Code § 480-13, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Hawaii by Class members and/or purchases by Hawaii residents.

f.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Illinois by Class members and/or purchases by Illinois residents.

g.  Iowa Code § 553.4 et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Iowa by Class members and/or purchases by Iowa residents.

h.  Kan. Stat. Ann. §§ 50-101, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Kansas by Class members and/or purchases by Kansas residents.

i.  Me. Rev. Stat. Ann. 10 § 1101, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Maine by Class members and/or purchases by Maine residents.

j.  Mich. Comp. Laws Ann. §§ 445.772, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Michigan by Class members and/or purchases by Michigan residents.

k.  Minn. Stat. §§ 325D.51, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Minnesota by Class members and/or purchases by Minnesota residents.

l.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Mississippi by Class members and/or purchases by Mississippi residents.

m.  Neb. Code Ann. §§ 59-801, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Nebraska by Class members and/or purchases by Nebraska residents.

n.  Nev. Rev. Stat. Ann. § 598A.060, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Nevada by Class members and/or purchases by Nevada residents.

o.  N.H. Rev. Stat. Ann. §§ 356:2, et. seq., with respect to purchases of Zetia and AB-rated generic equivalents in New Hampshire by Class members and/or purchases by New Hampshire residents.

p. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in New Mexico by Class members and/or purchases by New Mexico residents.

q. N.Y. Gen. Bus. Law § 340, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in New York by Class members and/or purchases by New York residents.

r. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in North Carolina by Class members and/or purchases by North Carolina residents.

s. N.D. Cent. Code § 51-08.1-02, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in North Dakota by Class members and/or purchases by North Dakota residents.

t. Or. Rev. Stat. §§ 646.725, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Oregon by Class members and/or purchases by Oregon residents.

u. 10 L.P.R.A. § 258, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Puerto Rico by Class members and/or purchases by Puerto Rico residents.

v. R.I. Gen. Laws §§ 6-36-4, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Rhode Island by Class members and/or purchases by Rhode Island residents.

w. S.D. Codified Laws Ann. § 37-1-3.2, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in South Dakota by Class members and/or purchases by South Dakota residents.

x. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Tennessee by Class members and/or purchases by Tennessee residents.

y. Utah Code Ann. §§ 76-10-3104, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Utah by Class members and/or purchases by Utah residents.

z. Vt. Stat. Ann. 9 § 2453, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Vermont by Class members and/or purchases by Vermont residents.

aa. W.Va. Code §§ 47-18-4, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in West Virginia by Class members and/or purchases by West Virginia residents.

bb. Wis. Stat. § 133.03, et seq., with respect to purchases of Zetia and AB-rated generic equivalents in Wisconsin by Class members and/or purchases by Wisconsin residents.

206. Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' violations of the laws set forth above, in that Plaintiff and Class members were: (1) denied the opportunity to purchase lower-priced generic Zetia; and (2) paid higher prices for Zetia and/or generic Zetia than they would have paid but for Defendants' unlawful conduct. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

207. Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

## XIV. DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully pray that the Court:

A. Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3); direct that reasonable notice of this action as provided by Federal Rule of Civil Procedure 23(c)(2) be given to the Class; and declare that Plaintiff is an adequate representative of the End-Payor Class;

B. Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

C. Declare the acts alleged herein to be unlawful under the state statutes set forth above;

D.      Award Plaintiff and the Class damages and, if applicable, treble, multiple, punitive, and/or other damages, in the amount to be determined at trial, including interest;

E.      Award Plaintiff and the Class the costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      Grant such other further relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct as the Court deems appropriate.

## XV.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the proposed Class, demand a trial by jury on all issues so triable.

Dated: April 17, 2018                          Respectfully submitted,

By /s/ *Christopher V. Le*_____
Christopher V. Le (VSB No. 75113)
**STRAUS & BOIES, LLP**
4041 University Drive
5th Floor
Fairfax, VA 22030
Tel:    (703) 764-8700
Fax:    (703) 764-8704
cle@straus-boies.com

Daniel E. Gustafson (*pro hac vice* forthcoming)
Karla M. Gluek (*pro hac vice* forthcoming)
Michelle J. Looby (*pro hac vice* forthcoming)
Brittany N. Resch (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK PLLC**
220 South Sixth Street #2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
kgluek@gustafsongluek.com
mlooby@gustafsongluek.com
bresch@gustafsongluek.com

55

Kenneth A. Wexler (*pro hac vice* forthcoming)
Kara A. Elgersma (*pro hac vice* forthcoming)
Justin N. Boley (*pro hac vice* forthcoming)
**WEXLER WALLACE LLP**
55 West Monroe St., Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
kae@wexlerwallace.com
jnb@wexlerwallace.com

*Counsel for Plaintiff Wisconsin Masons' Health Care Fund and the Proposed End-Payor Class*